**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____

HUGO ARISTÓTELES CASTELLANOS
MONZÓN,

     Petitioner,

  v.

INGRID FABIOLA DE LA ROCA,

     Respondent.

_____

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 16-0058 (FLW)(LHG)

**OPINION**

**WOLFSON, United States District Judge**:

   This matter comes before the Court on a petition for the return of a child, H.C., to Guatemala pursuant to The Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.*, filed by Petitioner Hugo Aristóteles Castellanoes Monzón's ("Dr. Castellanoes" or "Petitioner"). Petitioner alleges that H.C.'s mother, Ingrid Fabiola De La Roca ("Ms. De La Roca" or "Respondent") wrongfully removed H.C. from his habitual residence of Guatemala and wrongfully retained H.C. in the United States of America. For the following reasons, the Petition is denied.

   Specifically, the Court finds that Petitioner has established a *prima facie* case of wrongful removal and/or retention under the Convention and ICARA. However, Respondent has demonstrated by a preponderance of the evidence that at the time the Petition was filed, H.C. had been in New Jersey for more than a year and has become settled in his new environment. Finally, the Court declines to exercise its discretion to order H.C. to be returned to Guatemala pursuant to Article 18 of the Convention. This decision is not a custody determination; instead, it is only a

ruling that H.C. shall not be ordered returned to Guatemala while any custody determination may be litigated.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are taken from the Petition for Return of Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent (dated January 5, 2016) [hereinafter "Petition"], and from the testimony and evidence received at the evidentiary hearing held before the Court on February 18 and 19, 2016.  *See generally* Transcript of Hearing, Vol 1 (Dated February 18, 2016) [hereinafter "1T"]; Transcript of Hearing, Vol 2 (Dated February 19, 2016) [hereinafter "2T"].

On November 6, 2004, Dr. Castellanoes and Ms. De La Roca were married in Guatemala. 1T21:9-15; Petition ¶ 5.  They have one child from their marriage, H.C., who was born in Guatemala on October 18, 2010.  1T21:16-21.  The parties separated on November 1, 2011. 1T22:5-8; 2T39:20-25.  On January 16, 2014, the parties agreed to formally terminate their marriage by way of a judgment of voluntary divorce by mutual consent ("Divorce Decree"). Petition ¶ 5, Ex. B; 1T25:10-11; 2T76:10-11.  The Divorce Decree provides that Ms. De La Roca would have custody of H.C. ("*guarda y custodia*"), and that Dr. Castellanoes would have visitation rights and was required to pay child support.  Petition ¶ 5, Ex. B.  On July 17, 2014, Ms. De La Roca removed H.C. from Guatemala and brought him to New Jersey, where he has remained to this day.  1T26:4-6; 1T28:11-17; 2T46:3-5.

On August 23, 2014, Petitioner filed an Application for Return of the Child with the Central Authority in Guatemala, which was later forwarded to the United States' State Department. Petition ¶¶ 15-16, 33-34.  Petitioner filed the instant Petition on January 5, 2016.  On January 6, 2016, the Court issued an Order to Show Cause requiring Respondent to appear with H.C. on

January 21, 2016, to schedule an expedited evidentiary hearing on the merits.  On January 21, 2016, the Court set a briefing schedule; ordered Respondent and H.C. to surrender their travel documents to Pretrial Services; ordered that Petitioner be allowed visitation with H.C. at the home of a friend located in Queens, New York; and scheduled the evidentiary hearing for February 16, 2016.  On February 1, 2016, the Court granted Respondent's request to adjourn the evidentiary hearing to February 18, 2016, to allow Respondent to serve expert reports.  The Court held evidentiary hearings on February 18 and 19, 2016.  At those hearings, the Court first determined that Petitioner had met his burden of establishing his *prima facie* case under the Convention.  *See* 1T6:8-16 to 15:6.  Following that initial determination, the Court heard testimony from the parties concerning Respondent's affirmative defenses, as well as from two expert witnesses, Victoria Sanford, Ph.D., and Robert T. Latimer, M.D., who appeared on behalf of Respondent.

### A.      Testimony of Respondent

Respondent testified that after the parties separated in 2011, she and H.C. moved into Respondent's mother's house, while Petitioner remained in the marital home, which Respondent's mother also owned, two blocks away.  1T22:11-18; 1T71:17 to 72:2.  According to Respondent, the parties had an oral agreement that allowed Petitioner to visit with H.C. three times a week, from 2-6 p.m., but Petitioner would visit more often than that and at different times than agreed upon, including late at night, which caused arguments between the parties.  1T22:19 to 25:4; 1T70:5 to 71-13.

After their separation, Respondent estimated that she called the police on ten occasions to complain about Petitioner, but acknowledged that she did not raise the issue of domestic abuse in her divorce proceedings.  1T69:6-15; 1T55:21 to 56:8.  Respondent testified that she obtained a

restraining order against Petitioner, but that it was "useless." 1T54:18-24. As Respondent explained:

> I say in vain because when Hugo would go to the house insisting on going in, even after the restraining order, I would call the police telling them Hugo is yelling, trying to go into the house, break into the house, the police would not arrive. When they did arrive, they would laugh at me. They would just make fun. Hugo, just the same. He would make fun of me saying: They can't do anything. This anguished me because that day going to the house without authorization, advance notice, and he would arrive there trying to go into the house just like that at any time, any hour.

1T55:6-18. Respondent testified that she was afraid that Petitioner would harm her: "[w]hen we separated, on one occasion he told me that wherever I was he was going to follow me and he would not stop bothering me for all of my life, and that if I found somebody, he would kill me." 1T60:15-18.

When asked for an example of how Petitioner was violent, Respondent stated that once, a short time after the parties were separated in 2011, 1T46:4-6, Petitioner arrived at the house at 11 p.m.:

> The baby [H.C.] and I were already sleeping. I was very scared that somebody is knocking at the door at that time. I went to open up. I live in a condominium, and [Petitioner] was just causing a commotion outside. I opened the door, and he started telling me that I was at fault for everything, for our separation. He grabbed me by the hair and took me up to my mother's room. All of the time he was telling me that he was going to kill himself and that it would be my fault. When we got to my mother's room, he pushed me against the closet, and then he was punching the closet trying to intimidate me, telling me that he was going to kill himself, and it would all be my fault. He pushed me onto the bed and started kicking my mother's bed; and at that time he tells me [H.C.] has to see the situation, and he wanted to take my son, who was at that time around seven months old, so that he could see everything that was happening. I got up from the bed, and I was able to put myself in front of the door where my son was, and I told him, [y]ou are not going to pass this point. I don't know how I was able to get into the room and close the door. He was outside. And I told him to calm down, and he started knocking very hard on the door telling me to come out. And I told him to calm down because I'm not taking the child out of here, and I would come out if he calmed down. So I locked the door from the inside with a key so he would not be able to come out, and I have the keys to the doors. He then threw his car keys at my face and said he was going to kill himself and that would be my fault. He left running. I ran after him. Then

4

> outside of the house he calmed down.  I told him to calm down, and he ran out of the condominium saying that.

1T44:15 to 46:3.  Respondent also testified that Petitioner was "violent" during the marriage:

> He usually was violent while we were married, and after that it intensified.  For example, if we argued in the car, he would threaten me by increasing the speed and he would do so.  Then he would say, [w]e're going to kill ourselves, and he would intimidate me with that by driving the car at high rates of speed.
>
> Q.     And [H.C.] was in the car with you?
>
> A.     He did it also while I was pregnant.  That's one of many situations of violence that I lived through.

46:11-20.  Another example Respondent provided involved Petitioner's request that Respondent search for lost paperwork two of three years after they were married, in which Respondent claims Petitioner grabbed her by the hair when she could not find the papers he needed.  1T48:5-21.

With respect to any alleged abuse of H.C. by Petitioner, Respondent described instances of H.C. returning from trips with his father with a cut lip, bruises, and bumps on his head, but conceded that H.C. informed her that he received these injuries while playing on a swings or jumping on the bed, albeit unsupervised by his father.  1T50:22 to 52:7; 1T53:14-25.  Respondent also recounted that on one occasion, H.C. returned to her with a soaked jacket and without a shirt, and that he was very cold, because his father had cleaned him after he vomited and washed his clothes, but did not dry them.  1T52:8 to 53:13.  Finally, Respondent also recounted that Petitioner would allow H.C. to sit between his legs while he drove, without a seatbelt, so that H.C. could pretend that he was driving.  1T54:1-16.  Respondent also described the way Petitioner treated her in front of H.C.:

> When he was violent and tried to come into the house, I would tell him to stay there. He would try to get into the house forcing the door, demanding that I had to listen to him in front of [H.C.].  I would try to close the door.  [H.C.] would also try to hold the door telling his father to leave.  He always witnessed or saw that situation. He knew how Hugo was treating me.

1T57:12-19.

Respondent began dating Luis Alberto Deleon ("Deleon") in June or July of 2013.  1T74:6-8.  Although Respondent and Deleon knew each other from school "20 years ago," 1T73:19-20, Respondent testified that their romantic relationship began over the internet, as Deleon was located in the United States.  1T74:9-13.  In or around August 2013, Respondent testified that she obtained a visa for H.C., with the consent of Petitioner, to travel to the United States.  1T25:12 to 26:5; 1T26:21-24; 1T28:3-5; 1T82:2-20.  Respondent took two trips to the United States, both without H.C.  The first trip, which lasted one week in November 2013, was to visit Deleon, and the two were engaged to be married.  1T26:7-19; 1T58:5-8; 1T74:14-17.  On the second trip, which lasted 15 days, Deleon and Respondent were married in Trenton, New Jersey, in a civil ceremony on March 13, 2014.  1T26:7-19; 1T 41:4-6; 1T58:5-8; 1T75:5-9; 1T80:7-12.  Respondent's mother cared for H.C. during both trips.  1T58:1-6.

At some point thereafter, Respondent testified that she told Petitioner of her intention to bring H.C. to the United States, and that she intended to live in the United States with H.C. permanently.  1T27:7-17.  She acknowledged that Petitioner denied his consent to remove H.C. from Guatemala.  1T27:18-19.  She also conceded that she did not inform Petitioner that she had remarried at that time.  1T75:10 to 77:5.

According to Respondent, in or about March of 2014, she filed a domestic violence complaint against Petitioner in Guatemala.  1T77:6-9.  She obtained a temporary restraining order ("TRO") against Petitioner, but, according to Respondent, she did not appear at the next hearing to make that order permanent "because [she] was already in the United States."  1T77:11-19.

On July 16, 2014, H.C. inadvertently informed Petitioner that he and his mother would be moving to the United States the following day.  1T82:21 to 83:8.  When questioned about whether

Petitioner confronted her about the move, Respondent admitted on the stand that she told Petitioner

that she did not intend to leave Guatemala, "because [she] was leaving.  [She] was fleeing.  [She]

could not explain to [her] aggressor that [she] was leaving."  1T82:21 to 83:8-9.  As Respondent

explained:

> I came to the United States because my life was in danger in Guatemala and the
> safety of my child because my ex-husband was very violent.  I suffered from
> harassment on his part for a long time, and the situation was already causing too
> much stress for the child and, of course, for me.
>
> Q.      Now, when you say you and your child were in danger, can you explain
> that?
>
> A.      Sure.  My ex-husband was very violent towards me.  We lived under threat,
> and he would go to the house, as I explained before, many times during the week
> harassing us, harassing me.  He always wanted to go to the house at the wrong
> hours, even at midnight.  He would even be violent with us.

1T43:6-19.  Respondent also conceded that when she arrived in the United States, she

misrepresented on her intake paperwork that she intended to return to Guatemala on August 7,

2014, because she in fact intended to seek asylum.  1T97:6 to 98:15.

Respondent brought H.C. to New Jersey on July 17, 2014.  1T28:11-17.  According to

Respondent, about a month after arriving, she informed Petitioner via text message "that they were

in New Jersey."  1T37:1-6.  Respondent gave Petitioner a telephone number to a cell phone and a

schedule so that he could communicate with H.C.  1T37:4-6; 1T58:19 to 59:18.  Respondent

informed Petitioner that she and H.C. were living in New Jersey, but not what the exact address

was "[o]ut of fear that he would come [to New Jersey] to do the same thing as in Guatemala."

1T60:2-11.  According to Respondent, Petitioner would call two times a week to speak to H.C. for

about an hour or so at a time.  1T37:7-14.  Respondent insisted on the phone calls being over

speaker so that she could hear both sides of the conversation.  1T38:5-23.  Respondent testified

that she often heard H.C. become "bored" and "anguished" from his conversations with his father.

1T39:16-21. As Respondent described Petitioner's phone calls with H.C.:

> Hugo would start by speaking badly of us.  He would speak to the child about very strong subjects.  He would ask about many things:  Where do you live, son?  What color is your car?  Who do you live with?  Where are you?  He would ask him for the address.  He would give him misinformation about us, that we were bad, that we were kidnappers.

1T39:4-13.  Respondent testified that, eventually, she expected Petitioner to be able to visit H.C. in the United States, but his threats and insults prevented her from becoming comfortable with that arrangement.  As Respondent explained:

> [H]e would have been able to come here and see his son.  But he didn't permit that that be so.  He started to speak badly to the child over the phone.  The idea was that he would start by being able to speak to his son, and then with the possibilities I would have and the assurance that I would have, he could start seeing him by video and later, according to his behavior, he would have been permitted to see the boy but in a safe manner.

> Q.      All on your terms. Correct?

> A.      Yes, because I was the one who was in fear.

> Q.      So you would control when and under what circumstances Dr. Castellanos would get to spend time with his son?

> A.      Based on the assurances that he could give me.

> Q.      And when was it during the year and a half between the time that you came to the United States in July of 2014 and the time that he filed this application that you gave him that opportunity?

> A.      It didn't happen because of the way that he insisted on speaking to the child and to attack us.  During all that time he sent messages insulting my husband and myself, threatening that he was going to find us, that he was already close.  I was scared because of that, and that's why he was not given that communication. I told him to speak to his attorney by text and that maybe through her we would be able to renew communications. But I received no word.

> Q.      When did you tell him that?

> A.      After we cut communications.  He continued sending the messages, and I told him that's why I cut the communications because of the situation with the phone and to call me so we could get together through her to rehabilitate this through her formally.

1T84:20 to 86:2.

Neither Deleon nor Respondent is a permanent legal resident of the United States.  Deleon is not a permanent legal resident, but he has a work permit, 1T42:12-13, and, according to Respondent, Deleon has applied for asylum on the basis of violence that he would face from Petitioner if he returned to Guatemala with Respondent.  1T41:14 to 42:8.  Similarly, Respondent's status is "legal in the sense that [she] ha[s] a work permit.  [She has] a case in Immigration or at Immigration for asylum due to violence."  1T41:11-13.

For the first year they were in the United States, Respondent and H.C. lived with Deleon's uncle and his family in Trenton, New Jersey.  1T28:15 to 29:25.  Starting in September or October of 2014, H.C. attended preschool at Kids Are First on East State Street in Trenton, New Jersey.  1T30:1-19.  H.C. enrolled in this preschool for the entirety of the 2014-15 school year, and was in attendance for the 2015-16 school year as well, which was still in progress as of the date of the evidentiary hearing.  1T30:24 to 31:11.  Respondent testified that H.C. attends school every day, from 9 a.m. to 3 p.m. 1T31:17-25.  Respondent takes H.C. to school in the mornings, and picks him up in the afternoon, but if she cannot, H.C's stepfather, Deleon, "takes care of that also." 1T33:14-18.

For the past five years, Deleon has been employed by a cleaning company, Commercial Cleaning, and is currently a manager of logistics.  1T34:7-16; 1T35:4-5.  Respondent works at the same company, 5 days a week, approximately 3 1/2 hours a day, from 5:30 to 8:30 p.m. 1T34:17 to 35:13.  Respondent testified that Deleon watches H.C. while Respondent is at work, since he works 6 a.m. to 5 p.m.  1T35:14-19.  Respondent described H.C.'s relationship with his step father

as "quite stable" because "[t]hey get along very well.  My child loves [Deleon] and my husband loves [H.C.] also.  My husband also appreciates [H.C.] quite a bit.  They share quite a bit.  They get along quiet well."  1T36:14-19.  "[D]uring the summer they go out to parks.  They'll rent a movie.  [H.C.] likes to see those movies.  And they'll have activities at the house, cleaning the house, putting things in order."  1T36:8-11.

Respondent explained that, in addition to H.C.'s "[s]chool activities," he also goes to church, participates in "church activities," and has acted in two plays.  1T32:3-5.  H.C. also has activities with his schoolmates and his neighbors "like birthday[s].  Just get-togethers.  Christmas.  New Year's.  Just get-togethers in general."  1T32:5-8.  Respondent described H.C. as having "many friends," 31:15-16, and that he speaks English "[q]uite well."  1T31:13-14; 1T32:23-24.  Although H.C. does not play any sports, 1T32:9-11, he does play at parks with other children "quite a bit.  He's surrounded by kids."  1T32:16-22.  H.C. also has a regular pediatrician that he goes to for regular check-ups, physicals, and to receive immunizations.  1T99:20 to 100:14.

In January or February of 2015, Respondent and H.C. moved from Trenton to one of its suburbs, Hamilton Township.  1T33:4-8.  Respondent made an arrangement with H.C.'s preschool to allow him to continue to attend, even though it is located in Trenton, because H.C. "had already adapted to that environment[.]"  1T33:11-13.  Only Respondent, Deleon, and H.C live at the new house in Hamilton.  1T33:19 to 34:6.  Respondent described her relationship with H.C. as "[t]ight.  Close relation."  1T39:22-24.  "[A]s his mother, I'm everything for him.  I'm always with him.  I always do everything with him.  With me he has a very ample communication, very open.  We talk a lot about many different subjects [such as] [s]ubjects like God, friendship, schooling.  He knows that he could ask me about anything."  1T40:3-9.

**B.    Testimony of Petitioner**

Petitioner testified that, before the parties' separation and divorce, he emotionally supported Respondent during her college education by "stimulating" her, supporting her economically, making sure her car ran well, and making sure that his schedule did not conflict with her studies. 2T38:7 to 39:7. Petitioner denied that fights occurred during the parties' marriage; instead, he testified that the marriage ended because it was "very cold." 2T36:12-18. Petitioner categorically denied all of Respondent's allegations of abuse, 2T36:22-24, stating he never hit her, pushed her, or pulled her hair. 2T36:25 to 37:5. He specifically denied the incident Respondent described of pushing Respondent in her mother's house and dragging her up to her mother's room. 2T37:6-12; 2T42:6-9. Petitioner also denied that he had ever driven with H.C. between his legs, explaining:

> When I would arrive, I would come into the parking area, I would ring so that my son could come out. He would get in the car, play around, and he always wanted to play driving like he was driving. Sometimes we would stay there just playing at the condominium, and he would get out. That was it. And when we were going out, I would always automatically sit him in his seat. I would take my place and just normally drive as you are supposed to.
>
> Q.    Where did you put his car seat?
>
> A.    It's in the back seat to the right.
>
> Q.    Did you ever drive with him on the roads between your legs?
>
> A.    No.
>
> Q.    Did you ever drive the car when he wasn't properly seated in his car seat in the back?
>
> A.    No.

2T51:15 to 52:6.

Petitioner stated that after the parties' separation, he remained in the marital home for about one year before moving to an apartment approximately two kilometers away. 2T40:9-17;

2T64:16-23.  Petitioner testified that he moved because, although he proposed reconciling with Respondent, she did not wish to do so and asked him to abandon the house.  2T41:2-7.  Petitioner described their relationship after the separation as follows:  "We always got along well.  We always respected each other.  And before divorcing we said that we would never harm our child by arguing for something that we could resolve with love towards him."  2T43:23 to 44:1.  Petitioner also introduced several photographs from 2011 and 2012, the time period when the parties were separated, which depict the parties together during various celebrations, including a friend's birthday party, Respondent's graduation, and Christmas.  2T56:6 to 61:4.

Petitioner testified that during their separation, the parties had an oral agreement that Petitioner could see H.C. every day.   2T41:8-23.  Petitioner stated that he works as a pediatrician at the Guatemalan Institute of Social Security, 2T35:23-24, and his regular work schedule runs from 7 a.m. to 1 p.m. 2T67:5-10.  Accordingly, Petitioner was able to see H.C. Monday to Friday, from 1 p.m. to 4 or 5 p.m., and he would only go to visit H.C. at other times if it were necessary, such as "if [his] son w[as] sick, or an emergency."  2T41:25 to 42:5.  According to Petitioner, he was not required to call before coming to visit H.C., 2T67:25 to 68:10, but he would call Respondent if he was going to be late.  2T66:4-20.  The only reason Petitioner did not visit with H.C. on the weekends is because Respondent would not permit it.  2T42:10-15.

On February 6, 2014, Respondent requested that Petitioner give his permission for H.C. to move to the United States with Respondent.  2T44:7-11.  According to Petitioner, Respondent explained:  "She said that she had a work offer, an offer of work, employment in the United States; that there was an institution that offered help to single divorced mothers; that she felt the education over here was good."  2T44:19-23.  Petitioner stated that he denied her request, 2T45:2-3, as he explained:

> I said: Ingrid, you can't give me such a simple reasoning. A child has all of the necessary conditions in Guatemala to have a home, love, food, clothing, education, recreation, extra activities, and above all, he's going to have the love of both parents even though we may be separated.

2T45:7-12.  Petitioner did acknowledge that, on a prior occasion, he gave his permission for H.C. to obtain a travel visa to the United States because he thought it would be nice to travel with his son to attend scientific medical conferences or go on vacations.  2T45:15-24.

According to Petitioner, one week after he denied Respondent's request to move to the United States with H.C. permanently, Respondent filed a domestic violence complaint against him. 2T44:13-14.  A TRO was entered against Petitioner on February 13, 2014, but, according to Petitioner, it was "dismissed without effect" in May of 2014, before Respondent left Guatemala, because Respondent "did not appear to ratify the complaint, nor did she appear to develop an investigation."  2T47:13 to 48:5.  Petitioner denied ever violating the TRO while it was in effect. 2T48:22 to 49:1.

Petitioner also denied that there was a TRO in effect against him on July 16, 2014. 2T47:2-5.  On that date, Petitioner testified that he ate lunch with H.C., during which H.C. announced "Pappy, tomorrow I'm going to the United States to see Buzz Light Year" with "his mother and Alberto."  2T46:5-12.  When Petitioner confronted Respondent, she denied that she intended to leave Guatemala, stating that "[c]hildren are always talking things, and they imagine things, but that it wasn't true." 2T46:13-20.   According to Petitioner, he has never given Respondent permission to remove H.C. from Guatemala to the United States permanently.  2T45:25 to 46:2.

Once Respondent had removed H.C. to the United States, Petitioner testified that she allowed him to speak to H.C. by phone only "[o]n very rare occasions," with the total number of calls being "[m]ore or less 10, 12 times." 2T53:18-23.  Petitioner testified that he did not know where Respondent was living when she was in the United States, and that he did not ask her where

13

she was staying.  2T79:5-9.  On the occasions when Respondent permitted Petitioner to speak with

H.C. over the phone, Petitioner described their conversations as follows:

> First off, I would tell him:  My son, I love you.  I miss you.  I need to see you.  I
> want to go so we can play together.  I want to take care of you.  I want to hug you.
> So the conversation would be how we miss each other.  My son would tell me that
> he missed me, that he wanted to see me, that some day -- at some time would I
> come to visit him?  He remembered when we were playing in Guatemala.  And
> maybe sometimes he would say about food, that he liked to eat avocado.  We would
> talk about his favorite foods.  On some occasions I asked him:  Are you learning to
> speak English?  And he would count off numbers: 1, 2, 3.  On one occasion he told
> me he was already studying or in school.  On one occasion he told me that he had
> a cough, and he remembered how I would bring him some medicine for his cough.
> One time he told me that he could already ride a bike without training wheels.  On
> other occasions he would tell me that he couldn't speak with me.  He would speak
> to me in a whisper:  Pappy, I miss you.  I love you.  I love you.  But I can't tell you
> that a lot because I'll be cut off.  Or he would say:  I have to go in.  I have to go.  I
> can't talk to you.  But it was like a tense atmosphere.  He would speak in a very
> paused style.  His answers wouldn't be spontaneous.  The first two calls I remember
> it was cut off.  I called back again, and he would be yelling: It's my father.  It's my
> father.  Pappy.  The following calls I would say:  Papito, how are you, my love?
> You could hear a pause.  Papito, I love you.  I miss you.  I do, too.  You could feel
> an uncomfortable atmosphere.  My son wasn't speaking freely.  He would say:  I
> have to cut you [off].  I can't speak anymore.  I'm sleepy.

2T54:14 to 56:5.  Based on his conversations with H.C., beginning "[m]aybe on the third call,"

Petitioner began to believe that his son was not doing well because his behavior was "not normal."

2T86:7 to 87:9.  Petitioner testified that H.C. "told me he wasn't in school or studying.  And one

occasion that I spoke to him he told me he was soon going to begin school or studying."  2T86:4-

6.  Petitioner stated that on some occasions, his calls with his son appeared to have been cut off.

2T87:10-24.  Petitioner denied ever speaking "badly" about Respondent to H.C.  2T84:21 to 85:25.

Petitioner stated that, other than the visitation permitted by this Court in January of 2016, the last

time he was permitted to speak with H.C. was on October 18, 2015, on H.C.'s birthday.  2T53:24

to 54:11.

### C.      Testimony of Dr.  Victoria Sanford

Respondent presented the testimony of Victoria Sanford, Ph.D., whom the Court qualified as an expert witness on how familial domestic violence, violence against women and children, is treated generally in the culture of Guatemala and, specifically, within the police structure and government of Guatemala City.   1T122:19 to 123:7.

Dr. Sanford explained that, prior to the passage of the feminicide law in Guatemala in 2006, violence against women was not treated as such, but rather as "intrafamilar violence."   1T123:17 to 124:17.   However, even after the passage of the feminicide law, Dr. Sanford testified that the prosecution rate for violence against women "continues to hang around 2 percent . . . [t]hat is, of the 50,000 or so cases of domestic violence reported in 2014, that 2 percent of them [were] actually investigated and sanctioned."   1T 125:7-14.   As Dr. Sanford explained:

> So what we can see is that there may be changes on the books, but what . . . end[s] up happening, I call it bureaucratic proceduralism because there is a lot of paperwork to be done and people fill out the paperwork but then they file it.  So you get the equivalent of a restraining order.  But instead of that restraining order going to authorities who would protect a person, they get filed.  So then the government of Guatemala says:  Oh, well, we gave out this many restraining orders this year.  But it doesn't affect how the law actually protects women.

1T125:15 to 126:1; *see also* 1T131:13-22.   With respect to the structure of the police and prosecutor's office, Dr. Sanford described endemic flaws ranging from a lack of coordinated and properly trained staff to the lack of a political will to see that the justice system works properly because it would be antithetical to powerful interests in Guatemala.  *See* 1T126:9 to 129:18.

Dr. Sanford opined that the effect of a TRO in Guatemala is "basically zero" because "it doesn't protect the women [and] [i]t doesn't stop the violence from continuing."  1T132:6-9.  Dr. Sanford also opined that women are "extremely vulnerable" in Guatemala:

> I think they are vulnerable because they have no recourse of protection because the institutions that we count on in this country to protect us don't function that way. And also because the spouse, ex-spouse, boyfriend, ex-boyfriend, whoever he is, he knows that he could do whatever he wants and get away with it.  He knows that

there is impunity.  Impunity in Guatemala, on the one hand, [it is] impunity because the people who are supposed to uphold and protect the law are violating it.  But it also means that people, whether they are in violent and public spaces or in private spaces, people who are violent know that they can get away with that violence.  They know that they can do it and nothing will happen.  So I think they are at extreme risk.  I think it's very dangerous.

1T135:10 to 136:12.

Dr. Sandford was also presented with hypotheticals, by the Court and Respondent's counsel, as to what would occur to a mother who made repeated domestic violence complaints against her spouse and fled to the United States with her child, but then returned to Guatemala. Dr. Sanford replied:  "I would say it's extraordinarily dangerous.  I would say it would be extremely dangerous to go back, and she would be at risk for violence, and that the person would know that. . . . Violence to her. Violence to her child. Violence to a family member."  1T136:3-12; *see also* 1T134:7 to 135:6; 1T148:12 149:10.

### D.     Testimony of Dr. Robert T. Latimer

Respondent also presented the testimony of Robert T. Latimer, M.D., as an expert in psychiatry.  Dr. Latimer testified that he conducted a 20 minute interview with H.C. on January 28, 2016.  2T6:7-14; 2T20:7-8.  Dr. Latimer stated that although he had reviewed records showing H.C. was exposed to domestic violence and "disagreeable situations at home previously," he "did not go into that with [H.C.] because it wasn't relevant to him at the time."  2T17:14-18.  On cross-examination, Dr. Latimer explained that he did not ask H.C. any questions about domestic violence because he "did not want to traumatize the child," but rather observe him in a steady state so that he could report on his observations as a clinical psychologist.  2T20:12-24.  Dr. Latimer opined generally that children between the ages of three to five "store feelings" and, if those feelings are "negative or destructive," then they "will come out eventually further on when the child grows into preadolescence and adolescence[.]"  2T18:11-15.

16

## II.     STANDARD OF REVIEW

"The Hague Convention ["the Convention"], Article 1, sets forth its two primary objectives: '(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'"  *Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010) (quoting Convention, Art. 1).  "The . . . Convention does not provide a forum to resolve international custody disputes, but rather it provides a legal process 'to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases.'"  *Id.* (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 263, 270 (3d Cir. 2007)).

"[T]he . . . Convention . . . provides that it is a breach of a petitioner's custody rights if a child who is habitually a resident of one country immediately before his removal is removed [or retained] from that country without the petitioner's consent."  *Langa v. Langa*, 549 F. App'x 114, 115 (3d Cir. 2014) (citing 42 U.S.C. § 11603(e)(1)(A)).  "Under the . . . Convention, the petitioner bears the initial burden of proving by preponderance of the evidence that the child was habitually resident in a State signatory to the Convention and was wrongfully removed to a different State as defined by Article 3.2."  *Karpenko*, 619 F.3d at 263.  In that connection, a court must determine:

> (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention.

*Id.* (quoting *Yang*, 499 F.3d at 270-71).

"Once the petitioner meets its initial burden, the respondent may oppose the child's return by proving one of [the] affirmative defenses," also known as "exceptions."  *Id.*; *see also*

Convention Art. 12. "These affirmative defenses are narrowly construed to effectuate the purposes of the Convention, and even where a defense applies, the court has the discretion to order the child's return." *Yang*, 499 F.3d at 271 (quoting *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006)); *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995). The exceptions can be divided into two categories, depending on the evidentiary standard necessary to satisfy them. *See* 22 U.S.C. § 9003(e)(2)(A), (B).

First, the court may refrain from ordering the return of a wrongfully-removed child if the Respondent establishes, by a preponderance of the evidence, one of the following exceptions:

> (1) that the proceeding was commenced more than one year after the removal of the children and the children have become "well-settled" in their new environment; (2) that Petitioner was not actually exercising the custody rights at the time of removal or retention, or consented to or subsequently acquiesced to the removal or retention; or (3) that the children object to being returned and have attained an age and degree of maturity at which it is appropriate to take account of their views.

*Delgado v. Osuna*, No. 4:15-cv-00360, 2015 U.S. Dist. LEXIS 114338, *20-21 (E.D. Tex. Aug. 28, 2015) (citing Convention Arts. 12 & 13; 22 U.S.C. § 9003(e)(2)(B)). Second, the Court may also refrain from ordering the return of a wrongfully-removed child if Respondent establishes, by clear and convincing evidence, one of the following exceptions:

> (1) that there is a grave risk that the return of the children would expose them to physical or psychological harm, or otherwise place them in an intolerable situation, or (2) that the return of the children would not be permitted by fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms.

*Id.* at *21 (citing Convention Arts. 13(b) & 20; 22 U.S.C. § 9003(e)(2)(A)). Nevertheless, Article 18 of the Convention permits the Court, at its discretion, to order the return of the child even where a defense is established. *See Lozano v. Montoya Alvarez*, __ U.S. __, 134 S. Ct. 1224, 1236-38 (2014) (Alito, J., concurring); *Yang*, 499 F.3d at 271.

## III. DISCUSSION

As a threshold matter, at the evidentiary hearing the Court determined, on the record, that Petitioner met his initial burden of presenting a *prima facie* case of wrongful removal and retention under the Convention, *i.e.*, that (1) the removal took place on July 17, 2014; (2) H.C.'s habitual residence immediately prior to the removal was Guatemala; (3) Petitioner had custodial rights to H.C. at the time of H.C.'s removal from Guatemala; and, (4) Petitioner was exercising those custodial rights at the time of H.C.'s removal from Guatemala. *See* 1T6:8-16 to 15:6. Because my reasoning was set forth in detail on the record, I will not repeat it at length here.[1]

Accordingly, the Court now turns to whether Respondent has satisfied her burden of establishing an affirmative defense under the Convention to oppose the return of H.C. to Guatemala during the adjudication of this custody dispute.   Here, Respondent asserts two affirmative defenses:  (1) that H.C. is settled in the United States, and (2) that returning H.C. to Guatemala represents a "grave risk" to H.C.[2]  As discussed in more detail below, the Court finds

---

[1] The Divorce Decree in this matter provides that Respondent would have custody of H.C., and that Petitioner would have visitation rights and was required to pay child support. Petition ¶ 5, Ex. B. However, as the Court explained on the record, the Court *sua sponte* contacted the Hon. Hiram E. Puig-Lugo, of the Superior Court of the District of Columbia, and the Hon. Brenda Gil Mayen, who sits on the Family Court in Guatemala City, and who both serve as International Hague Network Judges as well. According to these judges, although the Divorce Decree provides Respondent with custody of H.C., *i.e.*, "*guarda y custodia*," the Decree's silence with respect to Petitioner's rights of *patria potestad*, or parental authority, indicates that he retained those rights under Guatemalan law. *See Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000) (holding that rights of parental authority constitute "custodial" rights under the Convention). Judge Gil Mayen also explained that Guatemalan parents with rights of *patria potestad* also have a *ne exeat* right, *i.e.*, the right to withhold consent to allow a child to be removed from the country, under Article 53 of the Migration Law of Guatemala. *See Abbott v. Abbott*, 560 U.S. 1, 10 (2010) (holding that a *ne exeat* right constitutes a "custodial" right under the Convention).

[2] "The affirmative defense of grave risk of harm requires proof by clear and convincing evidence." *Baxter v. Baxter*, 423 F.3d 363, 373 (3d Cir. 2005); *see also* 22 U.S.C. § 9003(e)(2)(A). This exception to return of a wrongfully removed child has been held to apply in at least "two sets of cases": (1) "when return of the child puts the child in imminent danger . . . *e.g.*, returning the child to a zone of war, famine, or disease," and (2) "cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for

that (1) Respondent has established by a preponderance of the evidence that H.C. is settled in the United States and (2) I will not exercise my discretion to order H.C.'s return.

### A.       The Settled Defense

Where a child is determined to have been wrongfully removed, Article 12 of the Convention provides that when proceedings have been "commenced" before "the judicial or administrative authority of the Contracting State where the child is," less than one year before the date of wrongful removal, the court (or other authority) must return the child "forthwith." Convention Art. 12.  If the proceedings are commenced "after the expiration of the period of one year," the court must order the return of the child "unless it is demonstrated that the child is now settled in its new environment."  *Id.*  Importantly, the one-year time period of Article 12 is not a statute of limitation and, therefore, not subject to equitable tolling, even in the case of concealment of a wrongfully removed or retained child.  *See Lozano*, 134 S. Ct. at 1235.  However, "expiration of the 1-year period in Article 12 does not eliminate the remedy the Convention affords the left-behind parent – namely, the return of the child."  *Id.* at 1234.  Instead,

> [t]he continued availability of the return remedy after one year preserves the possibility of relief for the left-behind parent and prevents repose for the abducting parent.  Rather than establishing any certainty about the respective rights of the parties, the expiration of the 1-year period opens the door to consideration of a third party's interests, *i.e.*, the child's interest in settlement.

*Id.* at 1234-35 (footnote omitted).

---

whatever reason, may be incapable or unwilling to give the child adequate protection."  *Baxter*, 423 F.3d at 373 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996)).  "For the grave harm exception to apply, the respondent must cite specific evidence of potential harm to the child upon his return."  *Id.* at 374 (citing *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004)).  As discussed below, the Court finds that H.C. is settled in the United States and, therefore, the Court does not address the parties' arguments whether returning H.C. to Guatemala would constitute a "grave risk" to H.C.

Nor is there any requirement that a petitioner first seek a child's return from authorities in the child's habitual residence before commencing "proceedings before the judicial or administrative authority of the Contracting State *where the child is*."   Convention Art. 12; (emphasis added); 22 U.S.C. § 9003(b).  Instead, Article 8 of the Convention merely provides that aggrieved persons or bodies "may" seek "assistance" from the Central Authorities of Contracting States in securing the return of children:

> Any person, institution or other body claiming that a child has been removed or retained in breach of custody rights may apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child.

In this instance, Petitioner previously applied to Guatemala's Central Authority for assistance in securing the return of H.C.  However, that application was neither a substitute, nor a prerequisite, for commencing "proceedings before the judicial or administrative authority of the Contracting State where the child is."  Convention Art. 12; 22 U.S.C. § 9003(b); *see also Koc v. Koc (In re Koc)*, 181 F. Supp. 2d 136, 149-50 (E.D.N.Y. 2001) (noting that there is no prerequisite that party file an application with Central Authority, reviewing the role of the Central Authorities under the Convention, and concluding that "[w]hile the Convention contemplates an active role on the part of the Central Authorities in each of the Contracting States in assisting in the coordination and enforcement of the Convention, it is clear that the ultimate adjudicatory function rests with the judicial or administrative authorities of the Contracting States who are responsible for deciding petitions under the Convention 'expeditiously.'").

With respect to the return of a child located in the United States, ICARA defines the "'commencement of proceedings,' as used in article 12 of the Convention," as "the filing of a petition in accordance with subsection (b) of this section."  22 U.S.C. § 9003(f)(3). Subsection (b) of Section 9003 of ICARA, in turn, provides:

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought *in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.*

22 U.S.C. § 9003(b) (emphasis added).  Accordingly, the date on which the judicial proceedings in this matter were "commenced" under Section 9003(b) of ICARA (and Article 12 of the Convention), is when the Petition was filed in the jurisdiction where the child was located, which, in this case, is the State of New Jersey.  *See, e.g.*, *Blanc v. Morgan*, 721 F. Supp. 2d 749, 762-63 (W.D. Tenn. 2010) (father's filing of action with French court and administrative authority did not "commence" proceedings within meaning of Article 12); *Wojcik v. Wojcik*, 959 F. Supp. 413, 418-21 (E.D. Mich. 1997) (petition not "commenced" within meaning of Article 12 where father only contacted Central Authority of the United States within one year).  Since Respondent removed H.C. from Guatemala on July 17, 2014, and Petitioner did not file the instant petition with this Court until January 5, 2016, the Court finds that this matter was not commenced within the one-year time period provided by Article 12 of the Convention and, therefore, the Court must consider whether H.C. is now settled in the United States.

Under ICARA, Respondent bears the burden of establishing the settled defense by a preponderance of the evidence.[3]  22 U.S.C. § 9003(e)(2)(B).  "In determining whether the 'settled'

---

[3] Petitioner asserts that "[a]lthough ICARA and the Hague Convention provide little in the way of guidance on the well-settled defense, the State Department cautions that 'nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof.'"  Pet. Br. 9-10 (quoting *Hague International Child Abduction Convention: Text and Legal Analysis*, 51 Fed. Reg. 10494 (1986)).  However, while Article 12 of the Convention is silent concerning Respondent's burden of proof, requiring only that "it [be] demonstrated that the child is now settled in its new environment," ICARA clearly provides that the "preponderance of the evidence" standard applies to the defenses "set forth in article 12 . . . of the Convention[.]"  22 U.S.C. § 9003(e)(2)(B).  Indeed, while Petitioner cites to the State Department's guidance, which was written two years before the passage of ICARA in

exception applies, the Court should consider any relevant factor informative of the child's connection with his or her living environment." *Silvestri v. Oliva*, 403 F. Supp. 2d 378, 387 (D.N.J. 2005). A survey of case law reveals that the factors courts typically consider in making this determination include: (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the parent's employment or other means of support; (6) whether the child has friends and relatives in the area; (7) to what extent the child has maintained ties to the country of habitual residence; (8) the level of parental involvement in the child's life; (9) active measures to conceal the child's whereabouts (and the possibility of criminal prosecution related thereto); and, (10) the immigration status of the child and parent. *See Dela Vera v. Holguin*, No. 14-4372, 2014 U.S. Dist. LEXIS 141512, *29-30 (D.N.J. Oct. 3, 2014); *Castillo v. Castillo*, 597 F. Supp. 2d 432, 438 (D. Del. 2009); *Silvestri*, 403 F. Supp. at 387-88; *see also Fuentes-Rangel v. Woodman*, 617 F. Appx. 920, 922 (11th Cir. 2015); *Lozano v. Alvarez*, 697 F.3d 41, 56-57 (2d Cir. 2012), *aff'd on other grounds*, __ U.S. __, 134 S. Ct. 1224 (2014); *In re B. Del C. S. B.*, 559 F.3d 999, 1009 (9th Cir. 2009). Importantly, "[w]hile useful, these factors are neither mandatory nor exclusive." *Broca v. Giron*, 530 F. Appx. 46, 47 (2d Cir. 2013). And, while "[a] more 'comfortable material existence' does not mean that the child is well settled," *Castillo*, 597 F. Supp. 2d at 438 (citation omitted), by the same token, "the child's life does not have to [be] perfect

---

1988, in an apparent attempt to portray Respondent's burden as a high one, the State Department's guidance actually suggests that Respondent ought to have a *lesser* burden than that required by ICARA, since "[s]ubstantial evidence is evidence that is *less than a preponderance*, but more than a mere scintilla. That is, [substantial] does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morgan v. Comm'r of Soc. Sec.*, 49 F. Appx. 389, 390 (3d Cir. 2002) (internal quotation marks and citations omitted) (emphasis added).

for [him] to be settled," *Lozano v. Alvarez*, 809 F. Supp. 2d 197, 233 (S.D.N.Y. 2011), *aff'd*, 697 F.3d 41 (2d Cir. 2012), *aff'd on other grounds*, __ U.S. __, 134 S. Ct. 1224 (2014).

Here, the Court finds that (1) Factors One, Two, Three, Four, Five, Six, and Eight weigh in favor of finding that H.C. is settled in the United States; (2) Factors Seven and Nine are neutral in the Court's analysis; and, (3) Factor Ten weighs against finding H.C. is settled in the United States.

"Although the child's age can arguably cut in either direction, courts generally conclude that repatriation of an infant is less burdensome on the child than repatriating an older child, who is more likely to have memories of the United States and more ties to the country." *Taveras v. Morales*, 22 F. Supp. 3d 219, 236 (S.D.N.Y. 2014) (citing cases), *aff'd*, 604 F. Appx. 55 (2d Cir. 2015). This is true of a child who is five years old, like H.C. *See, e.g.*, *Lozano*, 809 F. Supp. 2d at 232 (finding age weighed in favor of finding a five year old was settled because, "[w]hile the child is only five years old, she is old enough to form attachments"). Indeed, both parties testified generally that H.C. is old enough to form memories and attachments. *See* 1T33:11-13; 1T36:8-19; 1T39:22 to 40:9; 2T54:14 to 56:5.

With respect to the stability of H.C.'s new residence (Factor Two), the Court notes that H.C. originally lived with his step-family in Trenton, 1T28:15 to 29:25, but has since moved in February of 2015 to a more permanent home in which only his mother and step-father reside. 1T33:4-8 to 34:6. Although changing homes might ordinarily signal a less stable residence, here, I find that H.C.'s change of residence from his mother's in-laws' house to a home with only his mother and step-father is clearly a move to a more stable residence. *Compare Ramirez v. Buyauskas*, No. 11-6411, 2012 U.S. Dist. LEXIS 24899, *53-54 (E.D. Pa. Feb. 24, 2012) (finding residence stable where children first resided with grandmother and then moved to nearby

townhome that was paid for by government subsidies), *with Dela Vera*, 2014 U.S. Dist. LEXIS 141512 at *30 (finding residence not stable where "[t]he children arrived in New Jersey two years ago and have lived in three different residences, and currently share an apartment with strangers Respondent has only known for a short period of time.").

Respondent testified that H.C. regularly attends school (Factor Three), speaks English well, and has even become so adapted to his school that it made sense to arrange for him to continue attending school in Trenton, despite recently moving to a different school system.[4]  1T30:1-19 to 31:25; 1T32:23-24; 1T33:11-13; *see also* 2T55:1-3 (Respondent testified that H.C. could count numbers in English).   Although Petitioner testified that H.C. informed him that he was not attending school, or would be only attending school soon, Petitioner did not identify when these communications took place.  *See* 2T86:4-6.  Respondent conceded that she could not enroll H.C. in school immediately when she arrived, because it was in the summer, but that H.C. began classes in the fall when the regular school term commenced.  1T30:6-11.  I find Respondent's testimony that H.C. has regularly attended school in New Jersey since September or October 2014 to be credible.  Moreover, Respondent testified without contradiction that H.C. regularly attends church and engages in church-based activities (Factor Four).  1T32:3-5.

The employment of both Respondent and Deleon appears to be relatively secure (Factor Five) from the testimony received, as both now work for the same company that Deleon has been employed by for the past five years.  1T34:7-16 to 35:13.  Moreover, it is likely that since Deleon's family was willing to house Respondent and H.C. when they first arrived in the United States, they

---

[4] The Court does not give credence to Petitioner's argument that, since H.C. has been attending preschool and must soon begin attending elementary school, this factor should weigh against finding H.C. is settled.  Pet. Br. 12.  Such transitions are a normal part of education; it would be a nonsensical result to hold that H.C.'s normal progression through the school system should be counted against finding that he is settled.

may well serve as another means of economic support to fall back upon (Factors Five and Six). Further buttressing Factor Six is Respondent's uncontradicted testimony that H.C. has many friends in the United States.  1T31:15-16; 1T32:5-22.

With respect to the level of parental involvement (Factor Eight), the Court finds that both Respondent and Deleon enjoy a close relationship with H.C., who both have work schedules which allow one or the other to be with H.C. when he is not in school.  *See* 1T33:14-18; 1T35:14-19; 1T36:8-19; 1T39:22 to 40:9.  I find Respondent's testimony concerning her and Respondent's level of parental involvement, ranging from chores to fun activities, like watching movies and playing in the park, to be credible.  Moreover, Respondent has also obtained a regular pediatrician for H.C. in the United States.  1T99:20 to 100:14.  *See Ramirez*, 2012 U.S. Dist. LEXIS 24899 at *55-56 (finding this factor in favor of settlement where parent enjoyed "a very close relationship with her children, for whom she is the primary caretaker" and further that "[t]he success with which the children adapted to the United States reflects well on respondent's ability to parent her children, including . . . getting her children vaccinated once they arrived in this country.").

This Court finds Factors Seven (H.C.'s maintenance of ties to Guatemala) and Nine (concealment) to be neutral in this matter.  Here, H.C. appears to have maintained few ties with Guatemala as a consequence of Respondent's decision to circumscribe his contact with his father. However, since it was Respondent's actions, and not H.C.'s actions, which resulted in H.C. having fewer ties with Guatemala, this Court finds Factor Seven is neutral in the Court's analysis.  *Cf. Ramirez*, 2012 U.S. Dist. LEXIS 24899 at *55 (finding lack of ties weighed in favor of settlement where the children identified more closely with the United States and "[t]here was no evidence that the children miss[ed] living in Mexico or any aspect of living there.").  Similarly, although the parties dispute the level of concealment involved in this case (*i.e.*, when Petitioner knew that

H.C. was specifically in New Jersey, rather than just the United States) and whether Respondent's fears for her and H.C.'s safety were warranted, this Court does not find that Respondent did not sincerely believe that they would be in danger should they return to Guatemala.  In light of Respondent's fear, it would appear that Respondent gave Petitioner as much contact with H.C. as possible under the circumstances and, indeed, intended to provide more contact once her safety concerns were allayed.  *See* 1T84:20 to 86:2.  Since H.C.'s location was concealed to some extent from Petitioner, albeit for apparently legitimate reasons from Respondent's perspective, the Court finds that Factor Nine does not weigh in either party's favor.

The only factor which appears to weigh against finding that H.C. is settled in the United States is his (and Respondent's) uncertain immigration status.  Although immigration status is not "singularly dispositive," the importance of this factor on settlement "will inevitably vary for innumerable reasons, including:  the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits."  *Dela Vera*, 2014 U.S. Dist. LEXIS 141512 at *30 (quoting *Lozano*, 697 F.3d at 57).  Respondent, Deleon, and H.C. are all non-permanent residents of the United States who have pending asylum applications based on the violence they fear they will suffer should they return to Guatemala.  *See* 1T41:14 to 42:13.  Thus, although they cannot be deported while their asylum applications are pending, *Dia Navigation Co. v. Pomeroy*, 34 F.3d 1255, 1259 (3d Cir. 1994), nonetheless, until a decision is rendered, their ultimate immigration status remains uncertain.  *See Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1260 (M.D. Fla. 2008) (finding that although Respondent and her children were illegal aliens who had filed petitions seeking asylum, "their residence in this country is not stable because neither [the mother] nor the children have legal alien status and, as such, are subject to deportation at

anytime."). *Cf. Dela Vera*, 2014 U.S. Dist. LEXIS 141512 at *31 (finding immigration status weighed against settled defense because when the parties' tourist visa expired, parent had "not applied for residency or any other visa on behalf of herself or her children" and, thus, were subject to deportation at any time).  Accordingly, although not dispositive, this factor weighs against finding H.C. is settled in the United States.

In summary, Respondent has produced evidence to show that a majority of the relevant factors weigh in favor of finding that H.C. is settled in the United States, that two factors are neutral, and that while one factor weighs against finding settlement – H.C.'s and Respondent's uncertain immigration status – it is not dispositive on the ultimate outcome.  Accordingly, the Court finds that Respondent has shown, by a preponderance of the evidence, that H.C. is settled in the United States.

### B.      The Court Declines to Exercise its Discretion to Return H.C. to Guatemala

Although the Court has determined that Respondent has satisfied her burden of establishing the settled defense, Article 18 of the Convention provides that "[t]he provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time."  Therefore, this Court must also consider whether to exercise its discretion, under Article 18 of the Convention, to order the repatriation of H.C. to Guatemala, even though he is now settled in the United States.   *See Lozano*, 134 S. Ct. at 1236-38 (Alito, J., concurring) (explaining that a court may order a child be returned, even when settled in a new country, because "Article 12 places no limit on Article 18's grant of discretionary power to order return."); *Yang*, 499 F.3d at 271 ("[E]ven where a defense applies, the court has the discretion to order the child's return.").

The parties' briefing presents no argument that the Court should exercise its discretion to order the return of H.C., under Article 18 of the Convention, focusing instead solely on whether

any affirmative defenses have been properly established.  Although the Court expressly declines to address the parties' arguments concerning whether returning H.C. to Guatemala constitutes a "grave risk" to H.C., nonetheless, in light of the testimony received from Dr. Sanders concerning how familial domestic violence is skewed unfairly against women by the culture and authorities in Guatemala, and Respondent's testimony concerning her fear of Petitioner, both of which I find credible, I will not exercise my discretion to order the return of H.C. to Guatemala during the pendency of any future custody determinations.

Finally, the Court stresses that its decision today is neither a custody determination, nor is it a determination that Petitioner cannot have any contact, whether in person or otherwise, with H.C., or where H.C. should ultimately reside.  *See Lozano*, 809 F. Supp. 2d at 234-35; *Wojcik*, 959 F. Supp. at 421 ("The Court's decision [to deny the petition because the child is settled] is not a decision on who should have custody of the children, or where the children should ultimately live, or even that the children are settled in the United States for the purposes of determining custody."). As Article 19 of the Convention clearly provides: "A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." Instead, the Court's ruling today is merely a determination that, under the principles set forth in the Convention and ICARA, H.C. shall not be ordered returned to Guatemala while any custody determination may be litigated.

## IV.    CONCLUSION

For the foregoing reasons, the Petition is denied.

Dated: April 5, 2016

/s/ The Honorable Freda L. Wolfson

United States District Judge